IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| **JASON ALLEN COOLEY** and | ) | Criminal Action Number |
| **DETRICK DANYALE JACKSON,** | ) | **2:08-cr-0094-UWC-RRA** |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION ON
MOTIONS TO SUPPRESS**

In this drug and firearms case, Defendants Jason Cooley and Detrick Jackson have moved to suppress the evidence as forbidden "fruit of the poisonous tree." Based on the evidence adduced by the Government at the suppression hearings of April 17 and May 6, 2008, the Court concludes that the Defendants were subjected to an unreasonable "seizure" by officers of the Birmingham Police Department in violation of the Defendants' Fourth Amendment rights; and that the Defendants did not abandon such rights.

Accordingly, by separate order, the motions to suppress will be granted, and the charges against the Defendants will be dismissed.

I. The Facts

Birmingham Police Officers Alvin Fortson and Kenneth W. Prevo are assigned

to the Narcotics Unit. On Friday, August 19, 2007, they were patrolling in the Five Points West area of the city, as part of the "Taking it to the Streets" program of the Birmingham Police Department ("BPD").[1]

Fortson was driving the patrol car. He suggested to Officer Prevo that they drive through the parking lot behind a package store and beauty salon located on Third Avenue West near 16th and 17th Streets, because arrests for drugs, prostitution, and illegal sales of CDs and videotapes had previously been made at or near that parking lot. The officers were looking for suspicious activities. (Rough Draft of April 17, 2008, Suppression Hearing at 7) (hereinafter "RD Tr").

As the officers approached the parking lot, they did not see anything suspicious. They saw a single car in the parking lot, a Dodge Charger, parked forward "up against the wall" of the beauty salon. (RD Tr. 8-9.) Two black males were seated in the vehicle. Fortson then said to Prevo: "Let's go up there in that parking lot because of the activities we had had here before. . . . [L]et's go in there and see could we see is anything going on in the parking lot . . . like them two there."

---

[1] As explained by Officer Fortson:

> And, basically, what we was doing in certain areas, we was investigating narcotics complaints, or even prostitution complaints. And basically what we was doing was just kind of riding around, pretty much looking for whatever we needed to address.

(Rough Draft of April 17, 2008, Suppression Hearing at 5.)

(*Id.* at 9.)

The officers could see the heads of the Defendants through the back window of the Dodge Charger.[2] But they could not see what, if anything, the Defendants were doing with their hands or arms. (*Id.* at 10.) Indubitably, the officers had not seen a traffic or seatbelt violation, nor an improper or missing license tag. (*Id.* at 26, 33, 47.) In Fortson's words:

> Well, we just wanted to investigate and see exactly what they was doing. Because, like I said, they — with their hands moving around and so forth, and just off my experience, when people usually sitting in a parking lot and heads going up and down and looking around as if something is going on, I just wanted to investigate to see was any type illegal activities going on, and be able — and also, just do a interview.

(*Id.* at 10, 11.)

Fortson then pulled directly behind the Dodge Charger, and blocked it in its parked position. (*Id.* at 12, 24-25.)[3] Because of the proximity of the patrol car to the

---

[2] Fortson testified that the men "would look to the right, look to the left, and their heads go down and they'll come back up and look – you know, looking suspicious, as if they was trying to see was anybody watching them." (RD Tr. at 9, 10.) Of course, the officers could not see the faces of the Defendants, only the rear of their heads and shoulders.

[3] On his initial cross-examination at the April 17 suppression hearing, Fortson testified:

> Q. You pulled in behind it and blocked it from backing up, didn't you?
> A. I pulled - - yes sir. I - - pulled in behind it. I did.
> Q. You pulled in right behind it and made it impossible for the car to back out.
> A. I'm not sure on that, sir.
> Q. If the car had backed up in an attempt to leave, it would have struck your car, wouldn't it?

Dodge Charger, it would have been impossible for the driver of the Dodge Charger to back-up and leave the parking lot unless the patrol car moved.  (RD Tr. 25, 34.) [4]

      A.      Yes, sir. He probably would have. Yes, sir.

(*Id.* at 25-26.)  At a later point in the cross-examination, Fortson testified:

      Q.      And you elected to pull in directly behind them, which prevented them from backing out, as you've said?
      A.      Yes, sir.
      Q.      Unless - - unless, as you said, you decided to move your car and let them out?
      A.      That's a if one.
      Q.      Well, that's what you said?
      A.      I know, but it's a if one, because I - - I don't think - - I think they had room to move if they had wanted to. But it might have would have caught my bumper if they'd - - you know, if he backed out.
      Q.      So.
      A.      And then, like I says - -
      Q.      - - he can't back out without getting your permission, can he?
      A.      Pretty much, no.
      Q.      Pretty much, no. And he can't move forward, because he's going to run smack dab into a brick wall of that building, isn't he?
      A.      Yes, sir.

(*Id.* at 33-34.)

[4]  Officer Prevo's testimony concerning the blocking of the Dodge Charger was unequivocal:

      Q.      And [Officer Fortson] pulled up behind him, right?
      A.      Yeah, he stopped behind him.
      Q.      He was close enough that that the car was not -  that car could not have backed out and left, could it?
      A.      It couldn't have gotten out.
      Q.      That was an impossibility, right, without striking the police car?
      A.      Right.

(*Id.* at 48.)

After blocking the Dodge Charger, Fortson and Prevo emerged from the patrol car. Each of them was uniformed. Fortson approached the driver's side of the Dodge Charger while Prevo approached the passenger side.

By the time Fortson reached the rear of the Dodge Charger, the driver, Defendant Cooley, cracked the door and started to exit from the vehicle. At that time, Fortson "gave [Cooley] a <u>direct order</u> to stay in the vehicle." (*Id*. at 16) (emphasis added). As Fortson continued to approach the driver's side, Cooley continued opening the door and getting out of the car. When he was in arms' reach of the door on the driver's side, Fortson then tried to push the door back towards Cooley in an effort to confine him to the car. But Cooley resisted; he continued to get out of the vehicle, pushing Fortson as he emerged from the car. As Cooley ran away from the parking lot, Fortson gave chase for roughly five blocks, but ultimately lost him. A third officer later found Cooley hiding under a bush near Princeton Elementary School.

Fortson detected the odor of marijuana when he reached the open door of the Dodge Charger as Cooley was exiting. He did not see any narcotics in the car before his chase of Cooley. (*Id*. at 26, 29.) He had not seen Cooley commit any crime when he gave Cooley the direct order to remain in the car.

Prevo was approaching Jackson on the driver's side as Cooley opened the

door and fled the scene. Prevo then drew his pistol-like Tazer and continued to approach Jackson. As Prevo drew near him, Jackson opened the door and exited the vehicle. (*Id*. at 49.) After he took a few steps, Prevo ordered Jackson to get down on the ground. Jackson initially complied with the command and got on the ground. While Jackson was on the ground, Prevo looked onto the front seat of the Dodge Charger and saw, in plain view, a small bag on the driver's side. He also smelled, for the first time during the incident, the strong odor of marijuana. As Prevo was looking into the car, Jackson suddenly jumped up, pushed the officer, and started to run. (*Id.* at 41.) Prevo then tazed him and brought him under control.

At the time that Jackson left the vehicle, and at the time Prevo ordered him to the ground, Jackson had not done anything wrong, in Prevo's view. Nonetheless, Jackson was not free to leave the car and the premises. (*Id*. at 50.)

The Court discredits Officer Fortson's testimony that the Defendants would have been free to leave if they had indicated that they did not wish to talk to the officers.[5]

Both Defendants were subsequently placed under arrest for physical harassment. The car was subsequently inventoried and backpacks were found under

---

[5] Fortson testified: "If they didn't want to talk to us and they wanted to leave, they'd have been free to leave. I would have moved my car and let them go on about their business." (RD Tr. at 28.) This testimony is wholly incredible on its face, in light of Fortson's subsequent testimony that he gave a "direct order" to Cooley not to get out of the car after Cooley opened the door.

both the driver's and passenger's seats containing marijuana, powder and crack cocaine, as well as oxycodone (a/k/a oxycotin), methadone, hydrocodone, ecstasy, and alprazolam pills. A firearm was found in the console of the rented Dodge Charger.

Cooley and Jackson were thereafter indicted by a grand jury of the Northern District of Alabama for: (1) possession of more than fifty grams of cocaine base ("crack'), oxycotin, methylenedioxymethamphetamine (a/k/a MDMA or ecstasy), methadone, and marijuana with the intent to distribute them; and (2) possession of a firearm (a Ruger .45 caliber pistol) after conviction of a felony. Each of the men were separately charged with possession of the firearm after conviction of a felony.

## II. The Applicable Law

### A. Fourth Amendment Seizures

The Fourth Amendment to the Constitution of the United States protects against "unreasonable searches and seizures."

As a general proposition, there are three categories of interactions between law enforcement officers and citizens which may implicate the Fourth Amendment. In the first category, police officers merely approach and question a willing citizen in a public place, without any coercion or detention. The Fourth Amendment is not applicable to this category of interactions. *United States v. Thompson,* 712 F.2d

Case 2:08-cr-00094-UWC-RRA   Document 29   Filed 05/07/08   Page 8 of 20

1356, 1359 (11th Cir. 1983). The second category involves investigatory stops of citizens by law enforcement officers, in which an otherwise unconstitutional seizure of the citizen is justified by an objective, reasonable suspicion of unlawful activity based on articulable and specific facts known to the officer when the seizure occurs. *Id.*; *Terry v. State of Ohio,* 392 U.S. 1 (1968); *United States v. Berry,* 670 F.2d 583, 598-99 (11th Cir. 1982). The third category of police-citizen encounter, such as an arrest, must be supported by probable cause. *Brown v. Illinois,* 422 U.S. 590 (1975); *Dunaway v. New York,* 442 U.S. 200 (1979).

In *Terry*, decided four decades ago, the Supreme Court recognized that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person." 392 U.S. at 16. Likewise, when police officers "make a traffic stop, the driver [and passengers of the car are] seized within the meaning of the Fourth Amendment." *Brendlin v. California,* 127 S. Ct. 2400, 2403 (2007). Thus, the law is settled: "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of physical force or show of authority' terminates or restrains his freedom of movement." *Id.* at 2405 (citing *Florida v. Bostick,* 501 U.S. 429, 434 (1991)).

The simple act of police questioning alone does not constitute a seizure. *Bostick,* 501 U.S. at 434. Moreover, "[t]he mere fact that a law enforcement officer

approaches an individual and so identifies himself, without more, does not result in a seizure." *United States v. Baker,* 290 F.3d 1276, 1278 (11th Cir. 2002). The applicable test in determining whether a seizure has occurred is whether, under all the circumstances, a reasonable person would believe that he was not free to leave. *Id*. at 1278. Under *United States v. Baker,*

> the police must exert a show of authority that communicates to the individual that his liberty is restrained, meaning that he is not free to leave. *See Terry,* 392 U.S. at 19 n. 16, 88 S. Ct. 1868. The show of authority can be in several forms, such as "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L.Ed.2d 497 (1980). In sum, 'the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.

290 F.3d at 1278 (some citations omitted). *See also United States v. Perez,* 443 F.3d 772, 777-78 (11th Cir. 2006).[6]

Relying on *United States v. De La Rosa,* 922 F.2d 675 (11th Cir. 1991)*,* the Eleventh Circuit has held that a Fourth Amendment "seizure" does not occur simply

---

[6] In *Perez,* the Circuit supplemented the list of non-exclusive factors relevant to the inquiry of whether a reasonable person would have felt free to leave under the totality of the circumstances. These include, without limitation, "whether a citizen's path is blocked or impeded; whether identification is retained; the suspect's age, education, and intelligence, [as well as] the length of the suspect's detention and questioning. . . ." 443 F.3d at 778.

because a police officer parks directly behind a vehicle occupied by persons whom the officer desires to interview. *Miller v. Harget,* 458 F.3d 1251, 1257 (11th Cir. 2006).[7] In the former case, the police officer pulled up directly behind the defendant's vehicle after the defendant had left the vehicle and was walking towards his home. When approached by the officer and asked for permission to search the vehicle, the defendant consented to a search of the vehicle. The search led ultimately to the cocaine and cash which formed the basis of the defendant's subsequent

---

[7] In *Miller v. Harget*, Officer Harget observed a vehicle weaving between lanes without signaling and making an improper turn onto a parking lot at 10:15 p.m. 458 F.3d at 1251. "After witnessing the traffic code violations, Officer Harget decided to investigate. [He] pulled into parking lot and parked directly behind the already parked . . . vehicle." *Id*. at 1253. He then got out of his car and approached the driver's side of the vehicle. Mr. Miller, the driver, lowered the window; and Officer Harget smelled alcohol immediately. In the exchange between the officer and Mr. Miller, a passenger in the car called the Officer a liar several times and Miller produced an expired car insurance card. Miller then refused to submit to a breathalyzer test.

On these facts, the Circuit held that even though Officer Harget had parked behind, and thus blocked the car Miller was driving, given the totality of the circumstances there was no seizure of Miller prior to the time the officer approached the vehicle, smelled alcohol, observed the Plaintiff's appearance and began to suspect Miller of being intoxicated. *Id*. at 1257; *see id*. at 1253. Until that point, "there was no 'show of authority that communicated to [Miller] that his liberty was restrained, meaning he was not free to leave.'" *Id*. at 1258 (citing *Perez,* 443 F.3d at 778).

The facts in the instant case differ dramatically from the facts in *Miller*. The defendants in the instant case were parked facing a wall, a patrol car pulled up directly behind the defendants' car, <u>two</u> uniformed officers approached the car on both the driver's and passenger's sides of the car and one of the officers gave the driver a direct order not to leave. Unlike *Miller*, in the instant case there was a "show of authority that communicated to [defendants] that [their] liberty was restrained." *See id*. Reasonable persons in the instant case most certainly would not have believed they were "free to ignore the officers and proceed on their own way.'" *See Beck*, 602 F.2d at 729; *Miller*, 458 F.3d 1248 (noting there is no seizure where "there is no behavior by the officer that would differentiate th[e] encounter from one where an officer approaches a stranded motorist to offer assistance.")

indictment. At trial the motion to suppress was denied, on the factual finding that the defendant "had returned home for the evening and was not anticipating using the automobile in the immediate future." *De La Rosa*, 922 F.2d at 678. Put another way, the parking of the patrol car behind De La Rosa's vehicle did not restrict his movement in any way, since he was not in the vehicle at the time it was blocked.

A seizure occurs, for Fourth Amendment purposes, "only when, by means of physical force or a show of authority, [a person's] freedom of movement is restrained." *Craig v. Singletary,* 127 F.3d 1030, 1041 (11th Cir. 1997) (quoting *United States v. Mendenhall,* 446 U.S. 544, 555 (1980)).

*United States v. Beck*, 602 F.2d 726 (11th Cir. 1979), like the instant case, involved an encounter between officers of the Birmingham Police Department and citizens. There, while patrolling a high-crime Birmingham neighborhood, two officers passed by and noticed a Chevrolet automobile occupied by two black males, parked on the left side of the road with its motor running. One of the officers knew everyone in the neighborhood; but failed to recognize either of the Chevrolet's occupants as a resident of the neighborhood. So the officers turned their car around, drove back to the Chevrolet, and parked their vehicle alongside it. One of the officers engaged the Chevrolet's occupants in a conversation, inquiring why they were in the area. The officer noticed that the occupants seemed extremely nervous;

and it appeared that something was being passed among them.

> [Officer] Spears decided to investigate further, and, as his patrol car was too close to the parked vehicle for him to get out, he pulled forward so he could do so. While pulling forward Spears thought he saw a cigarette come out of the Chevrolet driver's window. After stopping his vehicle, Spears got out, walked back to the Chevrolet, and noticed the cigarette on the ground. He directed Beck to get out of his car, obtained Beck's driver's license, and placed him in the rear of the patrol car. Spears then returned and picked up the cigarette, which appeared to be (and in fact was) marijuana. He also noticed a small plastic bag on the ground beside the open driver's door, which contained a syringe and what again appeared to be marijuana. He picked up the bag, looked into the Chevrolet, and observed in plain view another syringe located behind the driver's seat on the floorboard. He then placed the Chevrolet's passenger in the patrol car with Beck [and] informed both men that they were under arrest for violation of the Alabama Uniform Controlled Substances Act. . . .
>
> Following these actions, Spears followed normal Birmingham police procedure by conducting an inventory of the Chevrolet's contents prior to impounding the vehicle. He opened the trunk and discovered two packages that bore United States Parcel Service (UPS) labels; they were later discovered to have been stolen from a UPS interstate shipment. The parcels form the basis for Beck's convictions.

602 F.2d at 727-28. On these facts, the Circuit concluded that "[b]y pulling so close to the Chevrolet, the officers effectively restrained the movement of Beck and his passenger; from the record it is readily apparent that they were 'not free to ignore the officers and proceed on their own way.'" *Beck*, 602 F.2d at 729. In the view of the Circuit, "the police actions [,when], viewed in the totality of the circumstances, did constitute [a stop for Fourth Amendment purposes]. Hence, it was lawful only if

based upon a reasonable suspicion that some criminal activity was afoot." *Id*. at 729.

> <u>There is nothing inherently suspicious about two black men sitting in a parked car</u>, with or without the engine running, <u>on a street in a black neighborhood on a midsummer afternoon</u>. They were not offending any traffic ordinance; there was no evidence of recent crimes in the neighborhood, no reason to suspect that Beck or his passenger were wanted by the police, and no other reason to believe that anything unusual was taking place. Spear's mere unfounded feeling that something might be afoot did not warrant his stop of the Chevrolet.

*Beck*, 602 F.2d at 729 (emphasis added).

### B. Abandonment

It has long been the law that the Fourth Amendment protection against unreasonable searches and seizures of property is lost when the property searched has been abandoned. As early as the first quarter of the last century, Mr. Justice Oliver Wendell Holmes held that the Fourth Amendment was not offended by the officer's examination of the whiskey contents of "the jug, the jar and the bottle" after they were abandoned as the defendants fled from revenue officers. *Hester v. United States,* 265 U.S. 57, 58 (1924). Where a defendant had gathered his desired belongings and permanently departed from his rented room, and a subsequent search of the room led to his indictment, the subsequent Mr. Justice (but then Circuit Judge) Blackman wrote for the Eighth Circuit: "Abandonment in fact had been effected before the search. It was purposeful and voluntary and the room's search could not possibly have violated any constitutional right of the defendant." *Feguer v. United States,* 302 F.2d 214, 250

(8th Cir. 1962).

Our circuit had no difficulty in finding abandonment in the circumstances where the defendant was speeding and the patrolman gave chase. Reaching speeds of up to 110 miles per hour, and with the turned-on siren and light of the pursuing police car, the defendant missed a turn, ran off the pavement, and stopped his car. He then jumped from the car, and fled on foot, leaving his lights burning and engine running. The police officer chased the defendant a short way, but gave up and returned to the car. The officer took the key from the ignition and opened the trunk, in which he discovered the incriminating whiskey. The court found that the opening of the trunk was not an unreasonable search; and that the " [d]efendant's right to Fourth Amendment protection came to an end when he abandoned his car to the police, on a public highway, with engine running, keys in the ignition, lights on, and fled on foot. At that point, defendant could have no reasonable expectation of privacy with respect to his automobile." *United States v. Edwards,* 441 F.2d 749, 751 (5th Cir. 1971).

In an *en banc* decision rendered two years after *Edwards,* the circuit held that where the defendants disclaimed any interest in certain briefcases and began to walk away from them prior to the search, and "[t]he police officers in no way compelled these actions," the defendants had abandoned the briefcases in which the sawed-off

shotguns were found. *United States v. Colbert,* 474 F.2d 174, 177 (5th Cir. 1973).

*United States v. Cofield*, 272 F.3d 1303, 1306 (11th Cir. 2001), summarizes the law of abandonment in our circuit.

> In determining whether there has been abandonment, the "critical inquiry is whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search. Whether abandonment has occurred is a question of intent that may be inferred from acts, words, and "other objective facts." While the individual whose property was searched bears the burden of proving a legitimate expectation of privacy in the items searched, the burden of proving abandonment is on the government.

*Cofield*, 272 F.3d at 1303 (citations omitted).

*Cofield* involved a warrantless search of the defendant's luggage at a train station. When approached by drug officers and requested to consent to a sniff of his luggage by a narcotics detecting dog, the defendant initially refused. Then the defendant removed the bags from his shoulders, put them on the ground, denied that the bags belonged to him, and attempted to walk away from the area. After the defendant denied that the bags belonged to him for a second time, the officers made a loud announcement asking whether the bags belonged to anyone. No one, including the defendant, claimed the bags. The officers then searched the bags and found over 1400 grams of crack. Under these circumstances, the Circuit concluded that Cofield had abandoned the bags; and that his decision to abandon the bags had not resulted

from any misconduct by the officers. *Id*. at 1307. Thus, the subsequent search by the officers did not violate the constitution.

It is indeed true, as a matter of law, that a criminal defendant's voluntary abandonment of evidence can remove the taint of an illegal stop or arrest. But it is equally true that to remove the Fourth amendment taint, the abandonment must be <u>truly</u> <u>voluntary</u> and not merely the product of police misconduct. *United States v. Pirolli,* 673 F.2d 1200, 1204 (11th Cir. 1982) (emphasis added).

If for example, in response to the unlawful kicking down of a hotel room's door by police officers, the room's occupants throw the stolen jewelry out of the window and it is retrieved by the officers, the jewelry cannot later be used as evidence at trial: "since the initial entry was improper and the items were thrown out of the window as a direct result of that illegality, the police [are] not entitled to the fruits and the admission of jewelry in evidence was reversible error." *Fletcher v. Wainwright,* 399 F.2d. 62, 64 (5th Cir. 1968).

Finally, in *Beck,* the circuit held that there was no abandonment where the defendant threw a marijuana cigarette, a bag containing marijuana, and a syringe out of his car window after the car had been blocked by Birmingham police officers. According to the court;

> These acts of abandonment do not reflect the mere coincidental decision of Beck and his passenger to discard their narcotics; it would be sheer

fiction to presume that they were caused by anything other than the illegal stop. Had Spears observed these items inside the Chevrolet during an unlawful stop they would have been suppressed; the fact that Beck and his passenger threw them out the window onto the ground after the commencement of an illegal stop and just prior to an unlawful arrest does not change this result. Here, because there was a nexus between . . . lawless police conduct and the discovery of the challenged evidence which has not become so attenuated as to dissipate the taint, the evidence should be suppressed. Since the discarded narcotics were tainted by the illegal stop, they cannot be used to validate the search which led to the discovery of the stolen UPS parcels[,] all are fruits of the initial illegal stop and consequently cannot be used against Beck.

*Beck*, 602 F.2d at 730 (internal quotations and citations omitted).

### III. Analysis

On consideration of the totality of the circumstances, this Court concludes that the Defendants were seized prior to the officers' discovery of the illegal drugs and the firearm.

Here, the only reason for the entry of the police officers into the parking lot was a desire to investigate for any suspicious activities. But there were no suspicious activities in the parking lot. All that they saw on that Friday afternoon was two black men sitting in a car parked behind a beauty salon. There was no improper tag on the vehicle, no loud noise coming from the car, no traffic violations, no evidence that either of the defendants was wanted by law enforcement, no evidence of any crimes in the parking lot – in short, there was "no . . . reason to believe that anything unusual was taking place." *See Beck*, 602 F.2d at 729. Fortson's hunch that

"suspicious activities" might be taking place was unfounded, and certainly did not amount to a "reasonable suspicion" of criminal activity.

When Fortson pulled up behind the Defendants' vehicle, he knowingly and effectively blocked their exit; as it was his determination to interview them.

The officers emerged from their marked patrol vehicle and approached the Defendants' vehicle in a manner which would suggest to a reasonable person that the Defendants were not free to leave. The officers were in uniform; and they approached each side of the Defendants' vehicle.

As the officers advanced on the Defendants' vehicle, and Defendant Cooley opened the door to leave the vehicle, Detective Fortson gave him "a direct order" not to leave the vehicle. The order was given in a military tone. As of the time that the order was given, there was no basis for a reasonable suspicion of criminal activity. The only basis for reasonable suspicion occurred after the direct order not to leave the car.

There is no doubt, but that Defendant Cooley was not free to leave his vehicle after Fortson gave the direct order not to do so. The inescapable truth of this finding is that when Cooley disobeyed the order, Fortson tried to block his exit and pursued him thereafter.

When Defendant Jackson left the car, in the absence of reasonable suspicion

of criminal activity on the part of the officers, he was ordered to the ground by Prevo. When he got up and tried to leave, Prevo shot him with a Tazer pistol.

Under all the circumstances, since "[t]here is nothing inherently suspicious about two black men sitting in a parked car, with or without the engine running, on a street in a black neighborhood on a midsummer afternoon," the Court concludes that the Defendants were not free to leave at anytime after their car was blocked and Forston gave a direct order not to leave. *See Beck*, 602 F.2d at 729.

The Court further finds that Cooley's flight from the scene, and Jackson's attempted flight, after their illegal, *i.e.,* unconstitutional, seizures did not constitute a voluntary abandonment of the vehicle. Cooley fled because his car had been blocked and the officers were approaching his vehicle in an unusual manner, in the absence of a reasonable suspicion of criminal activity. Jackson attempted to flee because he had been ordered out of the car and to the ground by Prevo, even though Prevo felt that Jackson had done nothing wrong.

It would be "sheer fiction" to conclude that Cooley's flight was caused by anything other than his unreasonable seizure. *See Beck*, 602 F.2d at 730. The nexus between the unconstitutional conduct and the discovery of the illegal drugs and firearm is direct and immediate; it is not sufficiently attenuated as to dissipate the taint of the unlawful seizures.

For these reasons, the motions to suppress must be granted.

Done this 7th day of May, 2008.

_____
U.W. Clemon
United States District Judge